# Legal Constraints on Lobbying Efforts in Support of Contra Aid and Ratification of the INF Treaty

The Administration may expend appropriated funds on grass-roots lobbying and assistance to private groups in support of ratification of the Intermediate-Range Nuclear Forces Treaty, but it may not communicate its support of the treaty through the undisclosed use of third parties.

The President, his aides, and cabinet officials may use appropriated funds for grass-roots lobbying in support of aid to the Contras until legislation is introduced. Although activities having the principal purpose of grass-roots lobbying would be prohibited after legislation is introduced, Administration officials could still engage in a wide variety of informational activities, such as writing letters, giving speeches, and briefing opinion leaders, as long as such communications on behalf of the Contras are not made in the guise of third parties.

February 1, 1988

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

## Introduction and Summary

You have requested the opinion of this Office concerning the extent to which the Anti-Lobbying Act, 18 U.S.C. § 1913, and section 109 of the Foreign Relations Authorization Act for Fiscal Year 1988, Pub. L. No. 100–204, 101 Stat. 1331 (1987), impose constraints on the use of appropriated funds for proposed lobbying efforts in support of continued aid to the Nicaraguan Contras and ratification of the INF Treaty.[1] These provisions create three separate restrictions on the use of appropriated funds for lobbying purposes: 18 U.S.C. § 1913 prohibits the use of appropriated funds for activities designed to influence members of Congress concerning any legislation or appropriation; subsection (1) of section 109 of the Foreign Relations Authorization Act for Fiscal Year 1988 prohibits expenditures for "publicity or propaganda" designed to influence members of Congress regarding pending legislation; and subsection (3) of section 109 prohibits the use of appropriated funds for "publicity or propaganda purposes not authorized by Congress."

We understand that the lobbying activities under consideration may include mass mailings requesting the recipient to contact members of Congress and urge that they support the Administration's positions. They may also include briefings

---

[1] This memorandum addresses as a matter of statutory interpretation only the extent to which these provisions restrict lobbying activities. Should these statutory prohibitions foreclose specific activities you wish to pursue, we would be pleased to consider in a supplementary memorandum the constitutionality of these prohibitions as applied to such activities.

of opinion leaders throughout the country by appropriate Administration officials, as well as coordinating private lobbying efforts in support of Contra aid and ratification of the INF Treaty. The Administration is also considering referring media requests for "op-ed pieces" or interviews to Administration supporters in the private sector, soliciting the media to publish articles by or interviews with private sector supporters of the Administration's positions, and possibly preparing "op-ed pieces" for publication over the signature of private sector supporters. In light of the time constraints under which our advice is sought, we have relied on this Office's traditional learning concerning the scope of section 1913 and have not reexamined our long-standing interpretation of this provision. Moreover, for the interpretation of section 109 of the Foreign Relations Authorization Act, we have relied largely on the Comptroller General's opinions interpreting previous publicity or propaganda riders. Of course, the opinions of the Comptroller General, an agent of Congress, are not as a general matter binding on the executive branch. Opinions concerning publicity or propaganda riders similar to section 109, however, are relevant to the construction of that section because they may well be the best indication of what members of Congress intended to prohibit by enactment of such a rider.[2]

Based on these sources, we have concluded that section 1913 and sections 109(1) and (2) are wholly inapplicable to lobbying efforts in support of the INF Treaty. Accordingly, appropriated funds may be expended on grass-roots lobbying and assistance to private lobbying groups at any time with regard to ratification of the INF Treaty. Section 109(3) is applicable to lobbying in support of the INF Treaty. This section prohibits the Administration from engaging in "covert propaganda." Accordingly, the Administration may not communicate its support of the treaty through the undisclosed use of third parties.

We also conclude that because (1) section 1913 has been interpreted not to apply to grass-roots lobbying by the President, his aides, or Cabinet officials within the scope of their official responsibilities, and (2) section 109(1) has been read to apply only to lobbying on behalf of pending legislation, the President, his aides, and Cabinet officials may use appropriated funds for grass-roots lobbying on behalf of aid to the Contras until the introduction of legislation on that subject. After the legislation is introduced, however, section 109(1) would prohibit the Administration from engaging in activities which have as their principal purpose grass-roots lobbying, but would not interfere with a wide variety of informational activities, such as writing letters, giving speeches, and briefing opinion leaders. Both before and after legislation is introduced, section 109(3) prohibits communications on behalf of the Contras that are made in the guise of third parties.

---

[2] Moreover, we note that the Comptroller General has a statutory role in certifying the expenses the Treasury may pay from appropriated funds. *See* 31 U.S.C. § 3526. Although we do not address or endorse the constitutionality of this provision, the Comptroller General's role in the certification process provides him with a means by which he may attempt to enforce his opinions in this area of the law.

**Analysis**

*A. Anti-Lobbying Act*

18 U.S.C. § 1913 provides:

> No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, request for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

Although section 1913's broad wording would seem to prohibit virtually any efforts by the executive branch to influence congressional action in matters of legislation and appropriation, the Department of Justice has consistently read the provision more narrowly. Both the Office of Legal Counsel and the Criminal Division have taken the position that section 1913 does not apply at all to the lobbying activities of those officials of the executive branch whose positions typically and historically entail an active effort to secure public support for the legislative proposals of their administration.[3] This construction is based on the language of the statute that exempts lobbying activities that are carried on pursuant to an "express authorization by Congress." The Department's view has been that, as to those officials whose positions typically and historically entail actively seeking public support for legislative proposals, continued appropriation of funds by Congress for such positions constitutes "express authorization by Congress" for the lobbying activities of these officials, and thus exempts their activities from section 1913.[4] Officials whose activities are covered by this "express authoriza-

---

[3] Memorandum for Arthur B. Culvahouse, Jr., Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re · Applicability of 18 U.S C. § 1913 to Lobbying Efforts in Support of Ratification of INF Treaty* at 6 n.7 (Dec 31, 1987) ("Culvahouse memo"), Memorandum for John R. Bolton, Assistant Attorney General, Office of Legislative Affairs, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re Applicability of 18 U.S.C. § 1913 to Contracts Between United States Attorneys and Members of Congress in Support of Pending Legislation* at 5–6 (Oct. 27, 1987) ("Bolton memo"); Memorandum for Paul Michel, Acting Deputy Attorney General, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Alleged Violations of 18 U.S.C. § 1913* at 2, 3–4 (Feb. 20, 1980) ("Michel memo"); Memorandum for Philip B. Heymann, Assistant Attorney General, Criminal Division from Thomas H. Henderson, Jr., Chief, Public Integrity Section, Criminal Division at 8–10 (Oct. 15, 1979) ("Henderson memo").

[4] Culvahouse memo at 6 n.7; Bolton memo at 5–6, Henderson memo at 8–10, Michel memo at 2, 3–4.

tion" exception to section 1913 include the President, his aides and assistants within the Executive Office of the President, and Cabinet members within their areas of responsibility.[5]

As to those officials who are within the coverage of section 1913, the Department has consistently interpreted the statute to prohibit only "grass-roots" lobbying by executive branch employees, *i.e.*, communication by executive branch employees directed to members of the public and intended to persuade them to lobby members of Congress. Even this restriction, however, does not apply to public speeches or writings in which executive branch officials urge public support for particular legislation, where such speeches or writings are not part of a large-scale campaign intended to galvanize the public into lobbying activity of its own.[6]

In sum, the Department has construed section 1913 to proscribe only

> conduct by those to whom no official lobbying responsibilities are delegated by the President or the head of an agency or department, and to limit lobbying activities outside the subject area of official responsibility of those with formal lobbying duties. The nature of the activities those subject to the statute may not engage in is limited to large-scale grass-roots efforts to generate contacts with Members of Congress.

Michel memo at 4 (footnote omitted).

## B. Foreign Relations Authorization Act

The remaining two restrictions on the use of appropriated funds for lobbying are contained in section 109 of the Foreign Relations Authorization Act for Fiscal Year 1988. That section states:

> No funds authorized to be appropriated by this Act or by any other Act authorizing funds for any entity engaged in any activity concerning the foreign affairs of the United States shall be used:
>
> (1) for publicity or propaganda purposes designed to support or defeat legislation pending before Congress;

---

[5] Although this Department has consistently construed section 1913 as not inhibiting the lobbying activities, including grass-roots lobbying, of the President, his aides and assistants in the Executive Office, and Cabinet members within their areas of responsibility, we suggest that this analysis should not be stretched to justify lobbying activities of unprecedented scope. Accordingly, we caution against grass-roots appeals, even by the President, that involve substantial expenditures of appropriated funds for such things as television or radio time, newspaper or magazine advertisements, or mass, unsolicited distribution of printed materials

[6] Culvahouse memo at 6 n.7; Bolton memo at 5; Memorandum for Robert J. Lipshutz, Counsel to the President, from John M Harmon, Assistant Attorney General, Office of Legal Counsel, *Re · Statutory Restraints on Lobbying Activity by Federal Officials* at 10–14 (Nov. 29, 1977) ("Harmon memo")

(2) to influence in any way the outcome of a political election in the United States; or

(3) for any publicity or propaganda purposes not authorized by Congress.

Pub. L. No. 100–204, tit. I, § 109, 101 Stat. 1331, 1339 (1987). Of these three provisions only subsections (1) and (3) are immediately relevant to the activities you have under consideration.[7]

Section 109(1) originally appeared as section 503(1) of S. 1394, the Senate version of the authorization bill. There is no legislative history directly bearing on the reasons for its introduction or the scope of the activities it was meant to prohibit.[8]

The Comptroller General has construed previous publicity or propaganda riders regarding pending legislation as prohibiting grass-roots lobbying. As a recent Comptroller General opinion put it:

> The Comptroller General has construed this kind of lobbying statute as applying to indirect or "grass-roots" lobbying. In other words, the statute prohibits appeals to members of the public suggesting that they, in turn, contact their elected representatives to indicate support of, or opposition to, pending legislation, thereby expressly or implicitly urging the legislators to vote in a particular manner.

B-226449, 1987 WL 102278, at *3 (C.G. Apr. 3, 1987). *See also* 56 Comp. Gen. 889, 890–91 (1977).

Appeals to members of the public to "let the Congress know how they feel on this critical issue" or to contact your representatives and make sure they are aware of your feelings concerning this important legislation are considered violations of the publicity or propaganda prohibition when the context of the appeal makes clear what views the public is being urged to communicate. B-178648, 1973 WL 21832, at *4 (C.G. Sept. 21, 1973); B-128938 (July 12, 1976); General Ac-

---

[7] To conform to the restrictions of section 109(2), any lobbying efforts should, of course, eschew any suggestion that legislators should be supported or defeated in any election because of their position on Contra aid or the INF Treaty.

[8] Publicity or propaganda riders date back at least to the early 1950s. *See, e g.*, Labor-Federal Security Appropriation Act, 1952, ch. 373, § 702, 65 Stat 223 (1951). The sparse legislative history available on this provision indicates that it was intended by its sponsor "to prevent as far as possible the spending of unreasonable amounts for propaganda and publicity purposes." 97 Cong. Rec. 4098 (1951) (remarks of Representative Smith of Wisconsin). The section's sponsor also expressed the belief, not entirely justified by experience, that "[w]e can well distinguish between what is propaganda and what is educational matter." *Id.* We do not find these comments particularly helpful in construing section 702 of the 1951 Act, much less so in construing section 109. We consider it likely that the Congress that enacted the Foreign Relations Authorization Act was more influenced by the recent Comptroller General decisions interpreting publicity or propaganda riders than by the relatively opaque remarks of a single congressman thirty-six years earlier.

counting Office, Principles of Federal Appropriations Law 3–136 to 3–137 (1982) ("GAO Manual"). An appeal to the public to contact members of Congress in regard to a particular issue is not legitimized by including a disclaimer that the appeal is made "regardless of whether those who contact their Congressman happen to be in agreement with me." B-178648, 1973 WL 21832, at *5 (C.G. Sept. 21, 1973).

On the other hand, the Comptroller General has not interpreted provisions identical to section 109(1) to prohibit communication to the public concerning legislation. In construing these riders, the Comptroller General has recognized that "[e]very agency has a legitimate interest in communicating with the public and with the Congress regarding its functions, policies, and activities." GAO Manual at 3–133. In decision B-178528, 1978 WL 10850, at *2 (July 27, 1973), the Comptroller General noted: "The President, his Cabinet, and other high officials have a duty to inform the public on government policies and, traditionally, high-ranking officials have utilized government resources to disseminate information in explanation and defense of those policies." Clearly the Comptroller General does not interpret the publicity or propaganda riders as prohibiting the use of appropriated funds for all communications concerning legislation. 56 Comp. Gen. 889, 890 (1977); B-178528, 1978 WL 10850 (C.G. July 27, 1973).[9] In other words, the Comptroller General essentially prohibits communications whose *raison d'etre* is generating public pressure to influence Congress. Communications

---

[9] We do not believe that either section 1913 or the publicity or propaganda riders impose any requirement of neutrality or balance in the presentation of the Administration's views. The Comptroller General has recognized that whenever an agency's policies or activities are affected by pending or proposed legislation, "discussion by officials of that policy or activity will necessarily, either explicitly or by implication, refer to such legislation and will presumably be either in support of or opposition to it " 56 Comp. Gen 889, 890 (1977) The Administration may advocate one side or the other on issues of public policy without violating statutory limits on the use of appropriated funds.

It is true that in two instances GAO considered government publications to constitute propaganda because they were "oversimplified" and "misleading." The first case involved a pamphlet distributed by the former Energy Research and Development Administration ("ERDA") entitled "Shedding Light on Facts About Nuclear Energy " The pamphlet, which had a strong pro-nuclear bias, purportedly had been created as part of an employee motivational program, but GAO found that ERDA had "printed copies of the pamphlet far in excess of any legitimate program needs and inundated the State of California with them in the months preceding a nuclear safeguards initiative vote in that State." GAO Manual at 3–140. GAO determined that the pamphlet constituted "propaganda" because it was "oversimplified and misleading," and recommended that distribution be halted and remaining copies destroyed Id GAO did not find, however, that publication of the pamphlet constituted an illegal use of appropriated funds because it was directed at state rather than federal legislation Id

The other instance in which GAO objected to publications because they were "oversimplified" also involved an issue concerning nuclear energy, the Clinch River Breeder Reactor Project. Upon review, GAO found that several of the publications were "oversimplified and distorted propaganda and as such questionable for distribution to the public " Id Because the publications had been funded with private money, however, the GAO found no violation of federal law.

We do not believe that these two cases impose any substantial limits on executive branch speech As already indicated, the Comptroller General has recognized in a published opinion that executive branch officials are not neutral on questions of public policy and that they must be free to express their views. The Comptroller General's unpublished opinions in the nuclear energy cases must be narrowly construed as limited to false or misleading factual information and not as imposing any general requirement of neutrality or objectivity Any other approach would raise very serious constitutional concerns.

35

setting forth an agency's position on legislation are permissible, however, even if their natural consequence is to increase the support for this position.[10]

A corollary to the Comptroller General's prohibition on grass roots lobbying is a prohibition on the provision of assistance to private groups engaged in lobbying on pending legislation. This is "an outgrowth of the concept that an agency should not be able to do indirectly that which it cannot do directly." GAO Manual at 3–141.

There are very few Comptroller General decisions in this area. The GAO Manual, however, states that the publicity or propaganda riders bar

> the use of appropriated funds to develop propaganda material to be given to private lobbying organizations to be used in their efforts to lobby Congress. An important distinction must be made. There would be nothing wrong with servicing requests for information from outside groups, lobbists [sic] included, by providing such items as stock education materials or position papers from agency files, since this material would presumably be available in any event under the Freedom of Information Act. The improper use of appropriated funds arises when an agency assigns personnel or otherwise provides administrative support to prepare material not otherwise in existence to be given to a private lobbying organization.

GAO Manual at 3–141.

This aspect of the Comptroller General's jurisprudence may be best characterized as a prohibition on active assistance to groups or individuals seeking to influence legislation. Administration officials may provide such groups only assistance that does not require the expenditure of additional appropriated funds. In short, the Comptroller General interprets the publicity or propaganda rider concerning pending legislation in much the same way that this office and the Criminal Division have interpreted 18 U.S.C. § 1913.[11] There are, however, two sig-

---

[10] Moreover, the Comptroller General has recognized that the publicity or propaganda riders provide little clear guidance in distinguishing permissible from prohibited expenditures He has stated:

> GAO will rely heavily on the agency's administrative justification. In other words, the agency gets the benefit of any legitimate doubt. GAO will override the agency's determination only where it is clear that the action was designed to influence Congress in certain precise ways

GAO Manual at 3–134. The Comptroller General does not "override administrative determinations and justification of propriety, except where they are so palpably erroneous as to be unreasonable in the face of the prohibiting statute." B-178528, 1978 WL 10850, at *2 (C G. July 27, 1973).

[11] Although publicity or propaganda riders have received little attention from this office, our conclusions have not been inconsistent with those of the Comptroller General. In a 1977 opinion we interpreted the riders as speaking to "mass distribution, the use of federal funds to underwrite a dissemination of some magnitude." Harmon memo at 5. The conduct that Congress sought to avoid was not routine executive branch lobbying of Congress or of particular citizen interest groups, but was rather "the unchecked growth of a government public relations arm used to disseminate agency appeals to the public at large." *Id* at 6

In keeping with this understanding, the Harmon memo concluded that the publicity or propaganda rider imposed no limitation on "the initial expression of an official's opinion," but only upon the "subsequent dissemina-

nificant differences. The Department of Justice has opined that section 1913 does not apply at all to the lobbying activities of those officials of the executive branch whose positions typically and historically entail an active effort to secure public support for the legislative proposals of their administration, at least to the extent that those officials engage in the kinds of activities typically and historically engaged in by the occupants of those offices. We have held that this exception to section 1913 includes the President, his aides and assistants within the Executive Office of the President, and Cabinet members within their areas of responsibility. Under our interpretation, these officials would be permitted to use appropriated funds to engage in grass-roots lobbying to the extent that such lobbying has typically and historically been engaged in by their predecessors. Nothing in the Comptroller General's opinions, however, suggests that the GAO recognizes a comparable exception under the publicity or propaganda rider.

The second major difference is that the publicity or propaganda rider applies only when legislation is "pending." The Comptroller General recognizes that this is a threshold requirement in determining the applicability of the publicity or propaganda rider. GAO Manual at 3–134. This interpretation is supported by a comparison of section 109(1), which refers to "pending legislation," with 18 U.S.C. § 1913, which specifically prohibits certain lobbying activities "whether before or after the introduction of any bill or resolution."

The final restriction discussed in this memorandum is the prohibition of section 109(3) on the use of appropriated funds for "publicity or propaganda purposes not authorized by Congress." This subsection was added in an amendment offered by Senator Kerry, who explained that his amendment was motivated by a particular abuse:

> During the Iran hearings, we learned of money that was being illegally spent by the State Department on propaganda efforts with respect to the whole issue of Central America. It was agreed by the members of the Foreign Relations Committee that there should be some criminal penalties attached to that and not merely a prohibition as to that activity.[12]

---

[11] (. . . continued)

tion by the Government of those views when they no longer qualify as a news event, *e.g.*, the mass mailing of unsolicited copies of an official's speech urging support of particular legislation." *Id* The memo cautioned, however, that the circumstances of a particular dissemination may bring otherwise inoffensive speech within the prohibition of the publicity or propaganda rider. As the memo noted: "[e]xtensive campaigns in support of administration proposals may . . . become so excessive as to amount to forbidden overreaching by the Executive Branch Under some circumstances, therefore, expression that is ordinarily outside the scope of the rider may well rise to the level of propaganda." *Id.* at n.14.

The same opinion noted two further limitations derived from the publicity or propaganda rider. First, the rider prohibits grass-roots lobbying. "An explicit or implicit call for citizens to contact their Congressional representatives with their views involves a clearly forbidden effort in the nature of propaganda to influence legislation " *Id* at 7. Finally, the memo suggested that "partisan expressions" were also "suspect," although it recognized that the rider did not prohibit taking a stand on a controversial issue *Id*

37

133 Cong. Rec. 26,496 (1987).

Although Senator Kerry did not specify what he meant by "money that was being illegally spent by the State Department on propaganda efforts with respect to the whole issue of Central America," it appears that he was referring to the self-described "white propaganda" operation conducted by the State Department's Office of Public Diplomacy for Latin America and the Caribbean ("S/LPD"). The Report of the Congressional Committees Investigating the Iran-Contra Affair describes the "public diplomacy" efforts of S/LPD as "public relations-lobbying, all at taxpayers' expense." H.R. Rep. No. 433 (S. Rep. No. 216), 100th Cong., lst Sess. 34 (1987). The report also quotes with apparent approval the Comptroller General's conclusion that the "white propaganda" efforts violated the restriction prohibiting the use of federal funds for publicity or propaganda purposes not authorized by Congress. *Id.* (quoting 66 Comp. Gen. 707 (1987)).

In his report the Comptroller General evaluated the legality of certain activities of the Office for Public Diplomacy. These activities included "arrang[ing] for the publication of articles which purportedly had been prepared by, and reflected the views of, persons not associated with the government but which, in fact, had been prepared at the request of government officials and partially or wholly paid for with government funds." 66 Comp. Gen. at 708. S/LPD also used a "cut-out" to arrange visits to various news media by a Nicaraguan opposition leader. *Id.* at 709. The Comptroller General found that these activities were "beyond the range of acceptable agency public information activities because the articles prepared in whole or part by S/LPD staff as the ostensible position of persons not associated with the government and the media visits arranged by S/LPD were misleading as to their origin and reasonably constituted 'propaganda' within the common understanding of that term." *Id.* Such activities therefore violated the rider of the Department of State appropriation act in effect at that time that prohibited "publicity or propaganda . . . not authorized by Congress."[13]

The prohibition in subsection (3) on the use of appropriated funds for "publicity or propaganda purposes not authorized by Congress" would thus appear to

---

[12] In addition to adding the prohibition on use of appropriated funds for publicity or propaganda purposes not authorized by Congress, Senator Kerry's amendment also provided criminal penalties of up to one year's imprisonment and/or a fine of up to $1000, as well as removal from office. 133 Cong. Rec. 26,496 (1987). The House bill did not contain a publicity or propaganda provision. At the conference, the two houses agreed to Senator Kerry's version, but without the criminal and employment penalties. 133 Cong. Rec. 35,491 (1987).

[13] The application of such publicity or propaganda riders to covert propaganda activities apparently originated in an opinion in October 1986 regarding the Small Business Administration. At that time the Administration was proposing to transfer the SBA to the Department of Commerce and to eliminate SBA's finance and investment programs and some management assistance activities. SBA prepared a substantial amount of public information material explaining and generally supporting the proposed changes. These included a pamphlet entitled "The Future of SBA," suggested editorials, and suggested "letters to the editor." The Comptroller General found no problem with most of the material, but noted he had "serious difficulties with SBA's distribution of 'suggested editorials' supporting the Administration's reorganization plan. The editorials, prepared by SBA for publication as the ostensible editorial position of the recipient newspapers, are misleading as to their origin and reasonably constitute 'propaganda' within the common understanding of that term." B-223098.2, 1986 WL 64325, at *6 (C.G. Oct. 10, 1986). The Comptroller General concluded that [t]he SBA 'suggested editorials' are beyond the range of acceptable agency public information activities and, accordingly, violate the 'publicity and propaganda' prohibition of section 601." *Id*

38

embody the view expressed in the Comptroller General's September 30, 1987, opinion that "covert propaganda activities of an agency" are an illegal use of appropriated funds.[14]

## C. Application of 18 U.S.C. § 1913 and Section 109 of the Foreign Relations Authorization Act to Lobbying Activities on Behalf of the INF Treaty and Contra Aid

### 1) INF Treaty

For the reasons set forth in our December 31, 1987, memorandum, we do not believe that the Senate's advice and consent to the ratification of a treaty constitutes "legislation." Although that memorandum discussed legislation within the context of 18 U.S.C. § 1913, we believe that it has the same meaning when used in the rider prohibiting the use of appropriated funds to influence pending legislation. Because we do not believe that the advice and consent of the Senate constitutes legislation, the publicity or propaganda rider of section 109(1) would be inapplicable to lobbying efforts in support of the INF Treaty. Accordingly, we conclude that neither the grass-roots lobbying restriction nor the prohibition on assistance to private lobbying groups would apply to your efforts in support of the INF Treaty.

It is clear, however, that the rider prohibiting covert propaganda activities would apply to ratification of the INF Treaty. The legislative history of section 109(3) implies Congressional approval of the Comptroller General's view, enunciated in his September 30, 1987, opinion, that the "not authorized by Congress" version of the publicity or propaganda rider prohibits covert propaganda activities. Accordingly, the Administration may not covertly communicate its support of the INF Treaty in the guise of a private group or individual.

### 2) Contra Aid

According to the Comptroller General, the legal restrictions of section 109(1) on lobbying in support of aid to the Contras depend on whether the lobbying occurs before or after legislation reflecting the Administration's position is introduced in Congress. In the absence of such pending legislation, section 109(1) is simply inapplicable to lobbying efforts. Moreover, under the Department's long-standing interpretation of section 1913, that provision would not restrict grass-roots activities of the President, his aides within the Executive Office of the President, or Cabinet members within their areas of responsibility. Accordingly, the

---

[14] B-229069, 1987 WL 95776, at *3 (C.G. Sept. 30, 1987). The Comptroller General has also consistently interpreted earlier riders prohibiting "publicity or propaganda . . . not authorized by Congress" as prohibiting agency "self-aggrandizement" or "puffery," *i.e.*, "publicity of a nature tending to emphasize the importance of the agency or activity in question." 31 Comp. Gen. 311, 313 (1952). It seems clear that this prohibition would not be applicable to any of your contemplated activities.

only restriction on Administration lobbying activities in the period preceding introduction of an Administration-backed bill derives from section 109(3), which prohibits covert attempts to mold opinion through the undisclosed use of third parties.

After an Administration-backed bill is introduced, however, section 109(1) would be applicable. Under the Comptroller General's interpretation, this provision would restrict Administration officials, including those in the Executive Office of the President, from engaging in grass-roots lobbying. It would not, however, restrict Administration officials from engaging in public informational activities such as writing speeches or letters in the areas of their official responsibility or briefing opinion leaders, even if the natural consequence of such activities is to increase public support for the President's position on legislation aiding the Contras.

According to the decisions of the Comptroller General in this area, the legality of providing assistance to private groups that support Contra aid will depend on whether the assistance requires the use of appropriated funds in excess of what would otherwise be expended. Accordingly, the Administration can make available to private groups, upon request, printed materials that explain and justify the Administration's position on Contra aid. These materials must be items that were created in the normal course of business and not specifically produced for use by these private groups.

We also believe that the Administration may respond to media requests for "op-ed pieces" or interviews by referring the media to supporters in the private sector, because such responses would not involve additional use of appropriated funds. It would be unwise, however, for the Administration to solicit the media to print articles by or interviews with anyone not serving in the government. And, of course, the Administration cannot assist in the preparation of any articles or statements by private sector supporters, other than through the provision of informational materials as described in the preceding paragraph.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*
